Nathan R. Sobel, S.
The issue raised in this proceeding has not been decided by any court — at least in any published opinion. *564 It concerns the right of a surviving spouse to elect against ‘ ‘ testamentary substitutes ’ ’, a right available in this State since September 1, 1966 (EPTL 5-1.1, subd. [b]).
The inter vivos transactions, which under the cited statute are treated as “testamentary substitutes”, are — (A) Gifts causa mortis-, (B) Totten trust accounts; (C) Joint savings accounts; (D) Other joint tenancies; and (E) Certain revocable transfers in trust or otherwise.
The new statute expanding the surviving spouse’s right of election against such testamentary substitutes provided:
A. Where a will is involved (1) the will must have been executed after August 31,1966; (2) the transactions must have been effected during the marriage; and (3) the transactions must have been effected after August 31, 1966. All three conditions must be present. Unless present, the inter vivos transaction is an “ exempt ’ ’ transaction and not a ‘1 testamentary substitute ”. There is no right to elect against exempt transactions.
B. Where there is an intestacy, (1) the person must have died after August 31, 1966; (2) the transactions must have been effected during the marriage; and (3) the transactions must have been effected after August 31, 1966. Again, all three conditions must be present. Unless present, the inter vivos transaction is an “exempt” transaction and not a “testamentary substitute ”. There is no right to elect against exempt transactions.
The issue is presented here in its simplest form. Decedent died intestate in 1970 leaving a widow and two children of an earlier marriage. The widow has been granted letters and will receive her intestate share of estate assets. She has filed a notice of election directed against Totten trust accounts. The issue is whether the transactions now described are exempt transactions or testamentary substitutes.
Decedent in 1960 had created two Totten trust accounts in equal amounts for his two daughters. If these had been left undisturbed, these would have been exempt transactions having been effected prior to August 31, 1966. However on April 11, 1968, after the effective date of the new statute, decedent transferred these accounts from one bank to another presumably because the second bank afforded higher interest rates. If significant (in the opinion of the court it should not be) the transfer was effected by the first bank issuing its checks to decedent and the redeposits of the identical checks in the second bank. In form and amount, the accounts remained the same. *565 The widow contends that these formerly exempt transactions became ‘ ‘ testamentary substitutes ’ ’ under the terms of the statute by reason of the redeposit after August 31, 1966.
The statute defining Totten trust accounts as ‘1 testamentary substitutes” provides — “ (B) Money deposited after August thirty-first, nineteen hundred sixty-six * * * in a savings account in the name of the decedent in trust for another person ”.
Literally opening a new account after August 31, 1966 would be “ money deposited ”. But there are considerations surrounding the use of that term and the policy of the statute which require discussion.
To note that this issue has not heretofore been decided, is not to say that it has not been presented. This identical issue and related issues in more complicated form have been raised in this court on several occasions but have been compromised between the parties. This has probably been the experience of other Surrogates.
The issue can arise and most frequently does, when a decedent changed the beneficiary after August 31, 1966 of a formerly exempt trust or joint account either because of the death of a beneficiary or because of a change of mind. It can arise and has (Matter of Filfiley, 63 Misc 2d 824) when after August 31, 1966 a Totten account is converted to a joint account and vice versa without change of beneficiary.
In the above regard, there is no “money deposited” when there is a change or substitution of beneficiary or a change in form of the account. As noted, there is “money deposited” when a trust or joint account is transferred from bank to bank. Yet, from the viewpoint of the purpose of the statute rather than its literal terms, it would be anomalous to hold that a mere transfer converts the exempt account into a testamentary substitute but that a change or substitution of beneficiaries does not. The statute may not be read literally. When drafted it obviously did not contemplate the transfers, substitutions or conversions discussed.
In one related situation, however, the statute is explicit. As heretofore noted, if the will is executed on or before August 31, 1966, no inter vivos transaction before or after that date is a testamentary substitute. However when after that date, testator executes a new will (or republishes an old will) all exempt inter vivos transactions entered into after August 31, 1966 become testamentary substitutes whether effected before or after the new will.
*566 The point made in the foregoing discussion is that issues of transfers, substitutions and conversions will recur with some frequency and that the governing statute may not be read literally. Hopefully a single principle may emerge which will cover all the related problems.
With respect to the specific issue before the court, that of a mere transfer of an exempt account from one bank to another, it may be noted that the testamentary substitute statute (EPTL 5-1.1, subd. [b]) was a recommendation of the Commission on Estates (Bennett Commission). We turn to such indicia of commission (and legislative) intent which is pertinent to that issue.
In its Third Report [1964] the commission stated: “ Only such transactions effected by the decedent after the marriage and after the effective date of the bill will be affected.” (P. 24).
In its Fourth Report [1965] the commission added (p. 28): “ The new statute would be prospective in operation only and affect wills executed after its effective date. It would not affect ‘ testamentary provisions ’ [term later changed to ‘ testamentary substitutes ’] made prior to its effective date so as not to disturb property settlements made in good faith.”
Later in the same report (Fourth Report-1965) in reply to a question posed by a Committee of the Association of the Bar, the Commission explained (p. 151): “He or she [surviving spouse] would neither be charged with nor could they assert claims against testamentary provisions [substitutes] which had taken place prior thereto.”
Slightly more relevant to the specific issue is a later comment in the 1965 Report. The same Bar Committee had expressed dissatisfaction with the proposed statute’s provision that a right of election would be applicable only with respect to wills executed after August 31, 1966 and transactions, after August 31, 1966. It suggested that irrespective of the date of execution of the will, the right to elect should be determined solely by the effective date of the inter vivos transaction. To this the Bennett Commission replied (p. 152): “ While the enactment of such a statute would be much easier to draft, would simplify the law and would prevent non-probate testamentary assets from escaping the .right of election, such enactment would, seriously interfere with property settlements which have now been made in good faith and in many cases might be unconstitutional if rights which have now vested in recipients of testamentary provisions [substitutes] were divested by the statute.” (Italics added.) We *567 may disregard the ‘ ‘ unconstitutional ’ ’ comment. What the commission was saying is that it would insist on exempting all inter vivos transactions on or before August 31, 1966 and also all such transactions irrespective of date where the will was executed on or before August 31, 1966. It implied ‘1 What has been done is done! We look only to future transactions made by testators under future wills. In time there will be no wills and no transactions executed prior to August 31, 1966 just as there are no longer many wills executed prior to September 1, 1930 (Decedent Estate Law, § 18, now EPTL 5-1.1).
The commission went far beyond constitutional or statutory limitations when it provided that a testator who executed a will on or before August 31, 1966 was free thereafter to effect inter vivos transactions long into the future while that will remained unrevoked.
In fact, the commission went far beyond necessity in another way in expressing policy. The act became a law on July 2,1965 (Decedent Estate Law, § 18-a, L. 1965, ch. 665). It became effective September 1, 1966, some 14 months later. Testators and their draftsmen were given an opportunity to “defeat” by appropriate action any right to elect against all future inter vivos transactions. (See Hendrickson, The Spouse’s New Right of Election — and WJiat to Do, Not Do, Undo and When ”, N. Y. State Bar J., Aug. 1966, p. 353 et seq.) In this respect the Bennett Commission followed the practice of the Foley Commission (Decedent Estate Law, § 18 became a law April 1, 1929 and became effective Sept. 1, 1930; see Twyeffort, The New Decedent Estate Law of New York, 6 N. Y. U. L. Rev. 377 [1929]). But there was a difference!
The Bennett Commission legislation was better balanced than that of the Foley Commission. The execution of a will prior to September 1, 1930 totally deprived a surviving- spouse of her right of election so long as that will remained unchanged. Under the Bennett Commission’s legislation the right to elect against testamentary assets remained undisturbed. But with respect to wills executed prior to September 1, 1966 the surviving spouse had no right to elect against testamentary substitutes in favor of others. But this disadvantage was balanced by an advantage. As long as inter vivos transactions for the benefit of others remained exempt transactions, all such transactions in favor of the surviving spouse remained exempt. With respect to wills executed before September 1, 1966, all past and future inter vivos transactions remain exempt whether for the benefit of *568 the spouse or others. The surviving spouse’s elective share against testamentary assets is not reduced by any inter vimos transactions for her benefit.
The instant case illustrates that advantage. Mr. Kleinerman at about the same time that he created the two Totten trust accounts in favor of his two daughters, also created one in favor of his wife. Upon his death after August 31, 1966 his widow receives her intestate share of the testamentary estate without regard to her own Totten trust account. If the two Totten trust accounts in favor of the children continue as exempt transactions she will receive in aggregate her intestate share of all assets testamentary and nontestamentary. If the accounts are determined to have become testamentary substitutes she receives her elective share of these accounts but without regard to her own exempt account — more than her intestate share of aggregate assets.
•Such extraneous considerations may not of course affect the legal determination. These are cited only to illustrate the balance sought to be achieved by the Bennett Commission. As it noted: ‘ ‘ While it is recognized that on one hand many transfers will escape the right of election and on the other hand the surviving spouse will receive a windfall in that he or she is not charged with such transfers, it is felt better to run that risk rather than the risk of unconstitutionality.” (Fourth Report, p. 152; italics added).
Little of what has been discussed heretofore is relevant to the specific point in issue except as it evidences general purpose and policy.
It furnishes no evidence of legislative intent on the questions in issue — the legal effect of redeposits, changes in beneficiaries or alterations in form of deposits made after August 31, 1966 in previously exempt inter vivos transactions.
On that main issue, the statutory language is also not helpful. As heretofore noted, five kinds of inter vivos transactions are included as “ testamentary substitutes ’ ’ in the statute. By their very definition there can exist no “ exempt ” gifts causa mortis. These are of no concern. With respect to Totten and joint accounts the statute speaks of “ money deposited ” after August 31, 1966; with respect to property held in joint tenancy and certain revocatory trusts and dispositions, it speaks of ‘ ‘ any disposition” made after August 31, 1966 (EPTL 5-1.1, subd. [b], par. [1], subpars. [B] to [E]). It would be a mistake to attach significance to this choice of language. While the commission reports do not explain this difference in terms, obviously *569 it was intended that any additional ‘ ‘ money deposited ” in an exempt trust or joint account would be to that extent a testamentary substitute. It is for that reason that the commission selected the term ‘ ‘ money deposited ’ ’ rather than a term more descriptive of its purpose such as accounts “ created ” or even “ any disposition in the nature of trust or joint accounts”. These latter terms might very well exclude mere transfers of accounts or mere substitutions or conversions.
In summary, it must be concluded that neither the commission nor the Legislature gave any thought to the problem before the court in any of its forms.
Parenthetically it is noted that the statutes of a few other States include inter vivos transactions in the testamentary estate for the purpose of the right of election. The decisions in these States have been examined and nothing pertinent has been found. (See, however, Brown Estate, 4 D. & C. 2d 722, affd. 384 Pa. 99.) So too with respect to “ change of date ” decisions in the income and estate tax area.
In the absence of legislative purpose or intent, the decision of the questions at issue is a matter of policy rather than of law. Such policy is best made by appellate courts. For this court the issue is close but a decision is necessary to send the matter on its way.
Some policy considerations are now discussed. In this regard some history is pertinent. When the right of election statute (Decedent Estate Law, § 18) was first proposed by the Foley Commission, that proposal was criticized in some quarters for failure to include provision for a right of election against inter vivos transactions. It may fairly be said that the omission of such a provision was intentional (Cox, Surviving Spouse’s Right of Election, 32 St. John’s L. Rev. 164,169 n. 42 [1958]). There followed a history of litigation over inter vivos transactions alleged to be “ illusory ”. (See Powers, Illusory Transfers and Section 18, 32 St. John’s L. Rev. 193-217 [1958].) These decisions began with an obvious effort by the courts to give strength and support to the spirit of section 18. But with the passage of time these decisions became more and more feeble. This is particularly true of the decisions governing inter vivos transactions in the form of Totten and joint accounts (LeStrange v. LeStrange, 242 App. Div. 74 ; Rubin v. Myrub Realty Co., 244 App. Div. 541 ; Bodner v. Feit, 247 App. Div. 119 ; Newman v. Dore, 275 N. Y. 371 ; Burns v. Turnbull, 266 App. Div. 779, affd. 294 N. Y. 889 ; Debold v. Kinscher, 268 App. Div. 786, affd. 294 N. Y. 668 [Totten trust] ; Krause v. Krause, 285 N. Y. 27 [Totten *570 trust] ; cf. Matter of Halpern, 303 N. Y. 33 [Totten trust]; Inda v. Inda, 288 N. Y. 315 [Joint account]).
In this same regard, however, mention should be made of a 1933 decision, Matter of Greenberg (261 N. Y. 474) as it expresses policy. Greenberg was decided when section 18 was new and the policy strong. Mr. Greenberg’s will was executed before September 1, 1930. Under such a will, his widow would not have a right of election. However, he executed a codicil after September 1, 1930. The court held on the basis of earlier decisions (Matter of Campbell, 170 N. Y. 84, 87 ; Matter of Brann, 219 N. Y. 263, 268) that the effect of a codicil is to republish the will and make the latter speak of the new date. Under the plain terms of section 18, the court held that the widow must be afforded her right of election. This is hardly significant since under the plain terms of the testamentary substitute statute (EPTL 5-1.1, subds. [b] and [c]) it would also be required. As noted earlier, the execution of a new will or the republication of an earlier will after August 31, 1966 would under the provisions of the statute give the surviving spouse the right to elect against any testamentary substitute created after August 31, 1966. The Greenberg decision is no answer to the issue before the court. As an expression of policy, which it is, it is consonant with contemporary decisions but not with the later decisions of the court (cf. Newman v. Dore, 275 N. Y. 371 [1937], supra, with Matter of Halpern, 303 N. Y. 33 [1953], supra).
The change of policy manifested by the courts is perhaps due to the fact that section 18 came into play only where the marriage relationship had deteriorated and only rarely where it remained normal.
This is the experience of this court. Considering the large number of estates which traffic through this court, the number of issues of the right of election per se and election against testamentary substitutes are relatively few. Almost invariably, however, the latter occur only where the marriage is marred by bitterness, dissatisfaction and antagonism.
From that viewpoint, the policy decision to be made is unimportant. The “ unhappy ” spouse will always find ways and means to diminish the other’s share of the testamentary estate. The statute creating the testamentary substitutes by no means closed the door to all or even most inter vivos transactions, for example inter vivos gifts and the transactions excepted by statute. (See EPTL 5-1.1, subd. [b], par. [2]); insurance, pension and Government savings bonds.)
How strong should be the policy with respect to testamentary substitutes?
*571 The manifestations of commission and legislative policy have been discussed. The commission excluded many transactions which could have been included. It postponed the effective date of the act for 14 months to afford testators an opportunity to secure existing and to make exempt future inter vivos transactions.
Judicial policy with respect to section 18 has been evidenced by the growth and decline in decisions governing illusory transfers.
A strong policy with respect to transfers, substitutions and conversions of exempt transactions will not necessarily result in the creation of testamentary substitutes. Other avenues are open to a testator desiring to limit the spouse’s intestate or elective share.
On the basis of all the foregoing considerations, this court concludes that the decedent Kleinerman did not convert an exempt inter vivos transaction into a ‘ ‘ testamentary substitute ” when on April 11, 1968 he transferred the Totten trust accounts in issue without change from the Boyal National Bank to the Dime Savings Bank of Williamsburg.
In so holding the court concludes that it was the purpose, intent and policy of the statute to prevent after August 31, 1966 diversion of individually owned assets which otherwise could become part of the decedent’s testamentary estate into Totten trust or joint savings accounts, viz., “testamentary substitutes”. Such accounts created on or before August 31, 1966 retain their character as exempt inter vivos transactions when transferred from one bank to another without increase in amount or change of beneficiary.
The court also holds that interest or dividends earned after August 31, 1966 on an exempt savings account are not testamentary substitutes.
Additional money deposited after August 31,1966 in a Totten trust or joint account (and interest or dividends earned thereon) becomes under the express terms of the statute a ‘1 testamentary substitute ’ ’.
The foregoing determines all the issues before the court. By arrangement with the parties, the issues have been submitted on an agreed state of facts to facilitate appeal.
This court may not and does not decide the collateral issues which may arise with respect to Totten and joint accounts. These are mentioned. What is the effect of a mere change of beneficiary after August 31, 1966 in such accounts? What is the effect of a substitution after August 31,1966 of a new beneficiary for a deceased beneficiary? In this latter regard it is observed
*572 that during a.joint tenancy the donor depositor is the owner of one half but upon the death of the other joint tenant he becomes as survivor the owner of the whole. Of course, a Totten trust is a revocable trust, the creator is during his lifetime the owner of the whole. With these considerations in mind, does a change or substitution of a beneficiary after August 31, 1966 transform an exempt account into a testamentary substitute. And lastly, what is the effect of a change after August 31,1966 in form only of an exempt Totten account to joint, or vice versa, without change of beneficiary? Here the considerations which apply to the decided issue would appear to govern.
What of joint tenancy in real or personal property (other than joint savings accounts). Would a change in or substitution after death of a beneficiary be a “ disposition of property made by the decedent after August thirty-first, nineteen hundred sixty-six ” (EPTL 5-1.1, subd. [b], par. [1], subpar. [D]).
What of a revocable trust or other revocable disposition (EPTL 5-1.1, subd. [b], par. [1], subpar. [E])? Would a change or substitution of a new beneficiary or substitution of new for old securities after August 31,1966 transform the status from an exempt transaction to a testamentary substitute? Fortunately we shall have fewer such revocable trusts as a result of the Tax Eeform Act of 1969.
All of these collateral problems are mentioned for good reason. A decision on the decided issue will have consequences on the collateral issues. For some time into the future we shall be confronted with such collateral issues. Some guiding principle will be helpful.